[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-13798

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 30, 2009
THOMAS K. KAHN
CLERK

D.C. Docket No. 07-60006-CV-JAL

FRENCH CUFF, LTD., a British Virgin Islands
Company as owner of the Atelier Outremer
64S Catamaran "ALIZE",

Plaintiff-Appellant,

versus

MARKEL AMERICAN INSURANCE COMPANY,
a foreign corporation,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(March 30, 2009)

Before TJOFLAT, BLACK and COX, Circuit Judges.

COX, Circuit Judge:

# I. BACKGROUND

In 2003, French Cuff, Ltd. purchased a new 64-foot catamaran, the Alizé, from a French manufacturer. In January of 2006, a vertical crack was found in the aft bulkhead of the port hull. The crack progressed towards the aft transverse support structure. The captain of the Alizé also discovered the port hull flexing up and down, and it appeared the port hull had separated from the aft transverse support structure. The captain of the Alizé, fearing further damage, brought Alizé to Tortola, where a marine survey was done. The surveyor concluded that the bulkheads and transverse aft supports had lost much of their structural integrity.

At the time of the discovery of the crack and hull flexing, Markel American Insurance Company insured the Alizé under a policy issued to French Cuff, Ltd. The Alizé was taken to Fort Lauderdale, where Markel hired David Jones, a naval architect and marine engineer, to inspect the vessel. Jones found cracks and fractures on the bulkheads, and found that the bulkheads had buckled and delaminated. He also discovered that the deck was too limber and caused a watertight hatch to pop open when the vessel was sailing. Finally, he found that the weldments for one chainplate had failed, and that the other chainplates were incorrectly engineered.

Jones concluded that the bulkheads had delaminated and buckled because the manufacturer had used a foam core that was either too thin or too friable.

2

Additionally, Jones concluded that the flexibility of the deck was caused by either the choice of the core material, the use of too thin a foam core, or the failure to build internal deck frames. He also believed the aft crossbeam was not properly secured to the bulkhead. And, he concluded that the chainplates were improperly designed because the chainplates failed before the clevis pins; they are normally designed so that the clevis pin fails first. Finally, the weldment was not large enough on the headstay chainplate.

French Cuff claimed a loss under the Markel policy. Markel refused to pay. French Cuff sued Markel,[1] alleging breach of contract. French Cuff contended that the loss was covered because the design and manufacturing defect exclusion of the policy had an exception for latent defects. The relevant portion of the policy is:

> We will not pay for loss, damage or expense caused by or resulting from:
>
> * * *
>
>     c.  manufacturer's defects or defects in design.
>           However, if the loss or damage has not
>           resulted from the negligence of any insured,
>           this exclusion does not apply to loss, damage
>           or expense directly caused by explosion,
>           bursting of boilers, breakage of shafts or any

---

[1]The Complaint asserted diversity, and not admiralty, jurisdiction. Because admiralty jurisdiction was not invoked under Fed. R. Civ. P. 9(h), the district court exercised diversity jurisdiction over the suit.

latent defect in the hull or machinery (excluding the cost and expenses of replacing or renewing the defective part);

(R.1-62, Ex. A at 8.)   A latent defect is later defined in the policy:

I.  Latent Defect means a flaw in the material of the Insured Yacht's hull or machinery existing when the Insured Yacht or [its] components were built and not discoverable by common means of testing.  Latent Defect does not include wear and tear, gradual deterioration, corrosion, rust, electrolysis, osmosis, weathering or inherent vice.

(*Id.* at 21.)

Markel moved for summary judgment, arguing that, to fall within the latent defect exception to the exclusions of the policy, the defect must not be a manufacturing or design defect.  Markel argued it was entitled to summary judgment because French Cuff had not put forward any evidence that the loss it claimed was caused by a latent defect, and not a design or manufacturing defect.

The district court granted summary judgment to Markel.  The court reasoned first that the contract unambiguously stated that a latent defect could not also be a design or manufacturing defect.  Based solely on this construction of latent defect under the policy, the court concluded that French Cuff had failed to put forward any evidence that the loss was caused by a latent defect, and so granted summary judgment to Markel.  French Cuff appeals.

4

## II. ISSUES ON APPEAL AND CONTENTIONS OF THE PARTIES

The parties agree that Florida law applies. Markel contends that the defects at issue in this appeal are manufacturer's defects or defects in design. (Appellee's Br. at 23.) French Cuff argues that, even if the defects at issue are manufacturer's defects or defects in design, they are also latent defects, and thus covered under the latent defect exception to the manufacturer's defects or defects in design exclusion. French Cuff also argues that it has put forward evidence that the loss was caused by latent defects. Markel responds that, under the policy, a latent defect cannot also be a manufacturer's defect or defect in design, and that French Cuff has not put forward any evidence that the loss was caused by a latent defect.

We decide in this appeal whether a latent defect can be a manufacturers' defect or defect in design under the policy, and whether French Cuff has put forward any evidence that the loss was caused by a latent defect as defined by the policy.

## III. STANDARD OF REVIEW

We review de novo the district court's grant of summary judgment. *Holloman v. Mail-Well Corp.*, 443 F.3d 832, 836 (11th Cir. 2006). Summary judgment is appropriate when the evidence, viewed in the light most favorable to the non-movant presents no genuine issue of fact and compels judgment as a matter of law. Fed. R. Civ. P. 56(c).

5

## IV.  DISCUSSION

We note at the outset that it was Markel's burden to prove that the loss was caused by an exclusion to the policy, and its argument is predicated on the notion that it proved that the loss falls under the manufacturer's defects or defects in design exclusion. *See State Farm Mut. Auto. Ins. Co. v. Pridgen,* 498 So.2d 1245, 1247-48 (Fla. 1986) (Once established that loss falls within coverage of policy, insurer has burden to prove loss falls within exclusion of policy).  After Markel carried its burden of proving that the loss was caused by an exclusion, the burden shifted to French Cuff to prove that the loss was caused by an exception to an exclusion.  *See East Fla. Hauling, Inc. v. Lexington Ins. Co.*, 913 So.2d 673, 678 (Fla. Dist. Ct. App. 2005) (burden on insured to show loss caused by exception to exclusion).[2]

French Cuff's first argument is that the district court erred in concluding that a latent defect could not be a manufacturer's defect or a defect in design.  We agree.

Under Florida law, courts must not read an insurance policy provision out of context, but rather should read the "policy as a whole, endeavoring to give every

---

[2]French Cuff argues that it need only make a prima facie showing that the loss was caused by a latent defect under *Tropical Marine Prods., Inc. v. Birmingham Fire Ins. Co. of Pa.*, 247 F.2d 116 (5th Cir. 1957).  Because French Cuff points to evidence of the specific cause of the loss, however, we do not address whether merely a prima facie showing would have been sufficient.

6

provision its full meaning and operative effect." *First Prof'ls Ins. Co. v. McKinney*, 973 So.2d 510, 514 (Fla. Dist. Ct. App. 2007) (citation omitted).

The policy excludes from coverage losses caused by manufacturer's defects or defects in design. Markel contends that the losses at issue here were caused by manufacturer's defects or defects in design, and we agree. But in a paragraph immediately beneath, and indented from that exclusion, the policy provides that, "this exclusion does not apply to loss, damage or expense directly caused by . . . any latent defect in the hull . . . ." (R.1-62, Ex. A at 8.) The policy makes clear that the manufacturer's defects or defects in design exclusion does not apply to a loss caused by a latent defect in the hull. Markel's argument that the manufacturer's defects or defects in design exclusion does apply to losses caused by latent defects is an attempt to write the latent defect exception out of the policy. Under Florida law, however, we must read each clause of the policy to give it effect, if possible. *Excelsior Ins. Co. v. Pomona Park Bar & Package Store*, 369 So.2d 938, 941 (Fla. 1979).

Markel urges us to construe the policy's definition of latent defect to preclude a manufacturer's defect or defect in design from being a latent defect. The plain language of the policy does not compel such a reading. Moreover, we refuse to construe the definition of latent defect in a way that reads out of the policy the latent defect exception to the manufacturer's defects or defects in design exclusion. *See*

7

*Coleman v. Valley Forge Ins. Co.*, 432 So.2d 1368, 1370 (Fla. Dist. Ct. App. 1983) (If terms of policy conflict, court should adopt construction that provides most coverage); *Excelsior*, 369 So.2d at 941 (policy provisions should be construed to reconcile apparent inconsistencies if possible).

The district court therefore erred when it concluded that a latent defect could not also be a manufacturer's defect or a defect in design. The court granted summary judgment solely on the basis that French Cuff "failed to designate 'specific facts showing that there is a genuine issue for trial' regarding whether latent defects *and not manufacturer's defects or defects in design* led to the damage to the Alizé." (R.2-102 at 12.) (emphasis added) (citation omitted).[3] But, the district court's grant of summary judgment is due to be affirmed if there is no evidence that the loss was caused by a latent defect as defined by the policy. We therefore examine whether French Cuff has put forward evidence that the loss was caused by a latent defect.

The policy requires that a latent defect be: 1) "a flaw in the material of the Insured Yacht's hull or machinery;" 2) "existing when the Insured Yacht or [its]

---

[3]The first sentence of the final paragraph of the district court's order granting summary judgment seems to suggest that the court concluded that French Cuff had not put forward any evidence of a latent defect, regardless of whether a latent defect could also be a manufacturer's defect or defect in design: "Plaintiff . . . has failed to proffer any evidence that the damage to the Alizé was the result of a latent defect." (R.2-102 at 12.) The final sentence of the same paragraph, however, makes clear that the court understood latent defect to be mutually exclusive with manufacturer's defects or defects in design. (*Id.*)

components were built;" and 3) "not discoverable by common means of testing." (R.1-62, Ex. A. at 21.)  Markel does not dispute that the defects existed when the Alizé was built, or that they were not discoverable by common means of testing. (Appellee's Br. at 23-34.)  Therefore, the only issue is whether French Cuff has put forward evidence that the loss was caused by a "flaw in the material" of the hull.

French Cuff argues it has put forward evidence that the loss was caused by a "flaw in the material" of the hull, and cites, among other things, the testimony of Jones that the foam core of the bulkheads was too thin or friable.  Markel argues that this is no evidence of a "flaw in the material," as the foam is perfectly good foam, it is just too thin or friable for use in the bulkheads of a 64-foot catamaran.  Put another way, if Alizé's bulkheads had a core made of perfectly good Jell-o instead of foam, there would be no "flaw in the material" of the hull under Markel's interpretation of "flaw in the material."  Rather, for Markel, there would only be a "flaw in the material" if the Jell-o was defective Jell-o, and not just improperly used in the hull of a 64-foot catamaran.  But, under French Cuff's interpretation of the clause, the use of Jell-o as the core of a bulkhead on a 64-foot catamaran would constitute a "flaw in the material" of the hull, even if it were perfectly good Jell-o.

Markel cites *Egan v. Washington Gen. Ins. Corp.*, 240 So.2d 875, 878 (Fla. Dist. Ct. App. 1970), and *Irwin v. Eagle Star Ins. Co.*, 455 F.2d 827, 830 (5th Cir.

9

1972), for the proposition that a latent defect cannot be a material which, although not defective in-and-of-itself, is not suited to the application it is used for on the vessel.[4] These cases are distinguishable because the policies at issue did not define latent defect. Here, a latent defect is defined as a "flaw in the material" of the hull and the only issue is whether the defects that caused the loss are "flaws in the material" of the hull.

The deficiency in the foam core of the bulkheads appears to be a significant cause of loss, so we next consider whether the presence of foam that is too thin or friable in the core of the bulkheads of a 64-foot catamaran is a "flaw in the material" of the hull under the policy, or if a "flaw in the material" can only exist if the foam is defective as foam, regardless of its thinness or friability. "Flaw" is not a precise term of art; it is defined in the dictionary as "a feature that mars the perfection of something; defect; fault." *The Random House Dictionary* 503 (rev. ed. 1980). Both parties' interpretations of what is a "flaw in the material" of the hull are reasonable. It is reasonable to conclude that foam cores of bulkheads that are too thin or friable have a feature that mars their perfection and are faulty and defective. And, Markel's

---

[4]In both cases, vessels were lost due to the use of bolts in the hull that were inappropriate for marine use, and the court held that the use of the improper bolt was not a latent defect. *See Egan*, 240 So.2d at 878 (bolt made of ferro-magnetic material that corroded in salt water not defective); *Irwin*, 455 F.2d at 830 (iron and brass fittings joined together and painted black, thus causing electrolysis and loss of vessel, were not latent defects since nothing wrong with the fittings themselves, only in the method of their use).

interpretation of "flaw in the material" of the hull to refer to chemical impurities or other defects in the material in-and-of-itself is also reasonable.

The parties thus put forward two competing, and reasonable, interpretations of the definition of latent defect under the policy. Under Florida law, if an insurance policy has two reasonable interpretations, one of which provides coverage, and another precluding coverage, it is ambiguous. *Auto-Owners Ins. Co. v. Anderson*, 756 So.2d 29, 33-34 (Fla. 2000) (citations omitted). An ambiguous provision in an insurance policy is construed in favor of the insured. *Id.* Accordingly, since the phrase "flaw in the material" in this policy is ambiguous, we construe it in favor of French Cuff to include defects such as foam that is too thin or friable for use as a bulkhead core, even though the foam may be perfectly good foam. French Cuff has therefore put forward at least some evidence that the loss was caused by a latent defect as defined by the policy, and thus summary judgment was inappropriate.

## V. CONCLUSION

Because we conclude that, under the policy in this case, a latent defect could be a manufacturer's defect or defect in design, and because French Cuff has put forward some evidence that the loss was caused by a latent defect as defined by the policy, we reverse the district court's grant of summary judgment, and remand for further proceedings consistent with this opinion. We leave it to the district court to

11

examine in the first instance whether the other defects (defects other than defects in the foam cores of the bulkheads) French Cuff complains of are latent defects causing a loss under the policy.

REVERSED AND REMANDED.